UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARLTON GRAY, | |
| Plaintiff, | 19 Civ. 3836 (KPF) |
| -v.- | **OPINION AND ORDER** |
| RAUL RAMOS, RAISA KATZ, LEON SCRIMMAGER, AMBER TESTA, and DAVID ONUORA, | |
| Defendants. | |

KATHERINE POLK FAILLA, District Judge:

Plaintiff Carlton Gray brings this *pro se* action under 42 U.S.C. § 1983, claiming deliberate indifference to his serious medical needs, in violation of the Fourteenth Amendment, by several prison medical personnel.  In brief, Plaintiff alleges that he was denied proper medical care by Dr. Raul Ramos, Dr. Raisa Katz, Dr. Leon Scrimmager, mental health provider Amber Testa, and physician assistant ("PA") David Onuora (collectively, "Defendants") — medical personnel at various carceral institutions run by the New York City Department of Correction ("DOC") — while incarcerated as a pretrial detainee from February 2018 until April 2019.  Defendants now move to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons that follow, Defendants' unopposed motion is granted, although the Court grants Plaintiff leave to replead certain of his claims.

## BACKGROUND[1]

### A.    Factual Background

Plaintiff's claims arise out of alleged denial of medical care during his pretrial detention at the Rikers Island correctional facility complex ("Rikers") from approximately February 2018 until April 2019 (the "Relevant Period"). (Hr'g Tr. 6:8-12, 4:19-25).  Although raising a host of issues in his Complaint, Plaintiff's claims of inadequate care focus on one major medical issue, his difficulty walking, which at times required the use of a wheelchair.  (*See* Compl. ¶ V).  The bulk of Plaintiff's allegations of misconduct arise out of injuries caused by, and interactions with medical professionals related to, this medical issue.  (*See id.*; *see generally* Hr'g Tr.).  However, in the interest of completeness, the Court addresses below all of the medical issues and allegations of misconduct that Plaintiff raises with respect to each of the named Defendants.

According to Plaintiff, his medical issues began even before he arrived at Rikers.  Plaintiff alleges that in the course of the arrest that resulted in his detention, he was assaulted by New York City Police Department ("NYPD") officers; that assault resulted in injuries for which he was twice taken to the emergency room.  (Hr'g Tr. 7:6-9).  Plaintiff further alleges that prior to his

---

[1]    This Opinion draws its facts from Plaintiff's Complaint ("Compl." (Dkt. #2)), as amended on the record on November 20, 2019 ("Hr'g Tr." (Dkt. #27)), the well-pleaded allegations of which are taken as true for purposes of this motion.  For convenience, the Court refers to Defendants' Memorandum of Law in Support of Their Motion to Dismiss as "Def. Br." (Dkt. #36).  Despite an extensive colloquy with the Court on this subject on the record on November 20, 2019 (*see* Hr'g Tr. 5:1-43:9), the nature and timeline of Plaintiff's interactions with Defendants — and the alleged misconduct ascribed to each — are not entirely clear.

arrest, he did not have any difficulty walking, and that it was the injuries sustained in connection with his arrest that caused him to require the use of a wheelchair.  (*Id.* at 7:21-8:6).[2]  Immediately upon Plaintiff's arrival at Rikers, he was evaluated by Katz, who was a physician at the Anna M. Kross Center ("AMKC").  (*Id.* at 9:15-24).  Katz informed Plaintiff that he might have a broken bone in his leg or kneecap.  (*Id.*).  Katz then sent Plaintiff to Bellevue Hospital ("Bellevue") for medical clearance, at which he also received medical attention.  (*Id.* at 9:25-10:4).  At Bellevue, Plaintiff was informed that he might have suffered a fracture in his tibia and/or knee, and physicians there recommended that Plaintiff be sent to an infirmary facility to limit his movement.  (*Id.* at 7:25-8:17, 11:3-8).

Upon his return to Rikers, Plaintiff was transferred to the North Infirmary Command ("NIC"), where he alleges he was under the care of Ramos.  (Hr'g Tr. 11:9-11, 15:13-16:1).[3]  Ramos told Plaintiff, contrary to the diagnosis he received at Bellevue, that "there was nothing wrong" with his leg, and that Plaintiff just had "a lot of fluid in his knee."  (*Id.* at 8:22-25).  Thereafter, Plaintiff spent approximately 28 days at the NIC, during which time Plaintiff had the use of a wheelchair.  (*Id.* at 12:20-22).  Plaintiff believed that he would

---

[2]     Plaintiff does not name any individual NYPD officers, the NYPD, or the City of New York as defendants in this action.  Rather, Plaintiff alleges that certain individual medical professionals violated his constitutional rights by providing inadequate medical care.  (*See generally* Compl.).

[3]     The NIC houses people in custody with acute medical conditions who require infirmary care, or who have a disability that requires housing that is compliant with the Americans with Disabilities Act.  *See Facilities Overview*, City of New York Dep't of Corrections, https://www1.nyc.gov/site/doc/about/facilities.page (last visited Mar. 1, 2021).

receive rehabilitative care for his injury at the NIC; while his medical records state that he did in fact receive physical therapy, Plaintiff claims otherwise.  (*Id.* at 11:20-12:14).  Plaintiff also alleges that the PAs in his unit at the NIC told Plaintiff that they were unable to share information about his condition with him, and that Plaintiff would need to speak to Ramos for such information.  (*Id.* at 12:15-19).

Eventually, Plaintiff was transferred out of the NIC, discharged from his wheelchair, given crutches, and sent back to the AMKC with no plan for further treatment.  (Hr'g Tr. 12:25-13:8, 14:6-10).  Plaintiff alleges that these events occurred at the direction of Ramos.  (*Id.*).  Plaintiff fell sometime after he arrived at the AMKC, which fall Plaintiff alleges occurred because he was not issued a wheelchair at the direction of Ramos and Scrimmager.  (*Id.* at 14:11-13, 38:11-14).  After his fall, Plaintiff had x-rays taken at West Facility, another medical facility at Rikers.  (*Id.* at 13:18-23).  Plaintiff was also evaluated by a PA who "noticed … a bulge [or] a bump on [Plaintiff's] left shoulder"; thereafter, Plaintiff was issued a wheelchair, given a sling for his arm, and transferred back to the NIC, where he was once again under the care of Ramos.  (*Id.* at 14:11-16:1).

At some point after his return to the NIC, Plaintiff was sent back to Bellevue, where he received an MRI of his shoulder, but no medical care for his leg.  (Hr'g Tr. 16:2-10).  After returning from Bellevue, Plaintiff alleges that Ramos refused to tell him the results of his MRI unless Plaintiff signed for his medical records.  (*Id.* at 17:24-18:12).  Plaintiff signed the forms, and thereafter

met with a PA who reviewed Plaintiff's medical chart with him and told Plaintiff that "something wasn't right" with his health, and that "they don't understand why [Plaintiff's] leg and foot is swollen … and why [Plaintiff is] unable to ambulate[.]" (*Id.* at 18:9-17). Plaintiff was further advised by medical staff that they had "spoke[n] to Dr. Ramos on several occasions, and they're just waiting for [Ramos] to respond[.]" (*Id.* at 18:17-19). Plaintiff was then transferred from the medical dorm in the NIC to the general population dorm at the NIC, where Plaintiff stayed for approximately 14 days. (*Id.* at 18:20-19:2). While at the NIC, Plaintiff was once again given the use of a wheelchair, was evaluated repeatedly at the request of Ramos, had his leg checked by doctors on a daily basis, and was prescribed Tylenol 3 with codeine. (*Id.* at 19:3-12).

In early December 2018, Plaintiff was transferred out of Rikers to the Brooklyn House of Detention ("BHD"), where he stayed for approximately 30 days. (Hr'g Tr. 19:21-20:23). Plaintiff alleges that his wheelchair was taken from him upon leaving Rikers; that he was denied a wheelchair and crutches at BHD; and that as a result, Plaintiff was forced to drag himself across the floor in order to move around the facility. (*See id.* at 19:21-21:08). Of note, Plaintiff claims that Ramos instructed the staff at BHD to deny Plaintiff access to a wheelchair, ostensibly because Ramos had seen Plaintiff walking at some point while Plaintiff was at Rikers. (*Id.*). Plaintiff was eventually provided a wheelchair around December 20, 2018, roughly two weeks into his detention at BHD. (*Id.* at 20:16-23).

In January 2019, Plaintiff was placed in punitive segregation at the George R. Vierno Center at Rikers ("GRVC," sometimes referred to as the "Beacon") for roughly 30 days.  (Hr'g Tr. 21:24-22:2).  Plaintiff alleges that he was placed in punitive segregation because he "was given a lot of infractions ... for not being able to move in a movement like everyone else[.]"  (*Id.* at 22:3-9).

In February or March of 2019, Plaintiff was transferred to the Otis Bantum Correction Center ("OBCC") at Rikers, where Plaintiff was initially denied crutches or a wheelchair.  (Hr'g Tr. 23:3-17).  Upon arrival at OBCC, Plaintiff was placed on a gurney, sat in intake for roughly 18 hours, and was forced to drag himself into his cell once released to his housing unit, which had stairs.  (*Id.* at 23:5-13).  Approximately four days after arriving at OBCC, Plaintiff experienced a medical emergency during which Plaintiff could not move and urinated upon himself.  (*Id.* at 23:18-25).[4]  After his medical emergency, Plaintiff was taken to the clinic and issued crutches.  (*Id.* at 23:13-24:7).  At the clinic, Plaintiff was told by medical staff that Plaintiff was "faking" and they had been instructed by Ramos "not to advise [Plaintiff] or provide [Plaintiff] with any wheelchair, and that the only thing that they [could] do" for Plaintiff was to provide him with crutches.  (*Id.* at 24:7-14).  Plaintiff alleges that he was not able to use the crutches because he "had the issues with [his] hands, [his] wrists and [had not been] properly instructed on how to utilize the crutches."  (*Id.* at 25:15-19).  As a result, Plaintiff needed "an inmate [to] assist

---

[4]     Plaintiff alleges that he was placed "on bed lock" in his cell because OBCC prohibited him from moving around the facility by dragging himself across the floor, which Plaintiff said was the only way he could move at that time.  (Hr'g Tr. 23:18-25).

[him] to try to utilize the crutches," and he had "an issue going up and down the stairs[.]" (*Id.* at 25:20-23). Plaintiff had crutches until the end of the Relevant Period in April 2019, when Plaintiff was transferred from Rikers to Ulster Correctional Facility. (*Id.* at 25:4-8, 25:24-26:7, 26:21-25).

As noted, Plaintiff advances a number of allegations against Defendants. Such allegations are not tied to specific incidents in the chronology just described, except where specifically noted below. To begin, Plaintiff alleges that Ramos: (i) gave permission to DOC personnel to use excessive force against Plaintiff (Hr'g Tr. 27:18-28:1; 28:18-23; 30:5-15); (ii) prevented Plaintiff from receiving assistance with his wheelchair such that he was required to push himself around with one foot (*id.* at 28:1-8); (iii) approached Plaintiff "in an irate and an aggressive manner, as if ... to ... touch" Plaintiff (*id.* at 28:8-10); (iv) misdiagnosed Plaintiff's injuries, falsely completed paperwork, or instructed other medical staff to complete false paperwork after Plaintiff was assaulted by staff (*id.* at 28:22-30:4); (v) instructed physicians to include in Plaintiff's medical records false claims about Plaintiff's ability to walk (*id.* at 31:10-14); (vi) violated the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, 110 Stat. 1936 (1996) ("HIPAA") by discussing Plaintiff's medical conditions (*id.* at 31:5-9); (vii) directed that Plaintiff be removed from the NIC (*id.* at 31:13-17); and (viii) left a directive in Plaintiff's medical records that Plaintiff be denied a wheelchair (*id.* at 27:14-19 (noting that this was not Plaintiff's "main complaint" against Ramos)).

With respect to Katz, Plaintiff alleges that although she was aware of Plaintiff's medical needs, she ignored Plaintiff's complaints and misdiagnosed Plaintiff's medical conditions.  (Hr'g Tr. 32:11-33:13).  Specifically, Plaintiff alleges that Katz refused to give Plaintiff medical attention for his injured leg and failed to send him to Bellevue for necessary medical attention.  (*Id.* at 33:18-25, 35:7-12).  That said, Plaintiff alleges that he saw Katz fewer than five times, and always while she was supervising other medical professionals.  (*Id.* at 34:16-18, 35:13-20).

Plaintiff states that Scrimmager reported to Ramos (Hr'g Tr. 35:23-24), and, more significantly, failed to provide Plaintiff with medical care at Ramos's direction (*id.* at 36:18-25)  Specifically, Plaintiff contends that Scrimmager failed to: (i) evaluate Plaintiff or send Plaintiff out for testing after Plaintiff was assaulted in May 2018 (*id.* at 36:1-6); (ii) provide Plaintiff with pain medication or send Plaintiff to Bellevue for further evaluation with respect to pain management (*id.* at 37:1-13); (iii) transfer Plaintiff from the general population to a more accommodating dorm where Plaintiff could receive assistance (*id.* at 37:14-21); (iv) accurately record consultations with Plaintiff, for example, by fabricating notes or by claiming falsely that Plaintiff refused to go to Bellevue (*id.* at 37:25-38:6); and (v) assist Plaintiff in remedying an issue with his wheelchair, causing Plaintiff to fall out of the wheelchair (*id.* at 38:7-14).

Plaintiff alleges that Testa supervised a mental health professional who evaluated Plaintiff in approximately March 2018, and that Testa allowed the

physician to have a correctional officer in the room during Plaintiff's evaluation, in violation of HIPAA. (Hr'g Tr. 38:21-40:16).

Finally, Plaintiff alleges that Onuora gave medical clearance for Plaintiff to be placed in punitive segregation, despite never physically evaluating Plaintiff. (Hr'g Tr. 40:22-41:10). Plaintiff further alleges that Onuora fabricated medical notes in which he documented that he evaluated Plaintiff when he did not do so. (*Id.* at 41:22-42:20).

## B.   **Procedural Background**

Plaintiff initiated this suit on August 20, 2019, by filing his original complaint. (Dkt. #2). Defendants filed a letter on October 17, 2019, seeking a pre-motion conference in anticipation of filing a motion to dismiss. (Dkt. #22). The Court held a pre-motion conference on November 20, 2019, at which conference the Court discussed with Plaintiff the factual and legal predicates for his claims. (*See generally* Hr'g Tr.). Plaintiff declined to file an amended complaint (*id.* at 45:9-46:15), but the Court deemed Plaintiff's complaint to be amended and/or supplemented as detailed by the Court and Plaintiff's colloquy on the record at the conference. (*See* Minute Entry for November 20, 2019; *see also* Hr'g Tr. 46:11-18).

By Order dated December 19, 2019, the Court set a briefing schedule for Defendants' motion to dismiss, giving Plaintiff an extended period to file his opposition papers. (Dkt. #30). Defendants filed their motion to dismiss and supporting papers on March 10, 2020. (Dkt. #34-36). Thereafter, on May 18, 2020, the Court granted Plaintiff an extension to submit his opposition. (*See*

Dkt. #43).  By Order dated July 8, 2020, the Court *sua sponte* granted Plaintiff

an additional extension to July 31, 2020, and warned him that failure to

oppose the motion by that date would result in the Court considering the

motion unopposed.  (Dkt. #44).  To date, Plaintiff has not filed an opposition to

the motion to dismiss, and indeed Plaintiff has not corresponded with the

Court since requesting an extension on May 14, 2020.  (*See* Dkt. #42).

## DISCUSSION

### A.   Applicable Law

#### 1.   Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

"[A]lthough a party is of course to be given a reasonable opportunity to

respond to an opponent's motion, the sufficiency of a complaint is a matter of

law that the court is capable of determining based on its own reading of the

pleading and knowledge of the law."  *McCall* v. *Pataki*, 232 F.3d 321, 322-23

(2d Cir. 2000).  Accordingly, "the plaintiff's failure to respond to a Rule 12(b)(6)

motion does not [itself] warrant dismissal," and the district court must

determine whether dismissal of the complaint is appropriate on the merits.  *Id.*

at 323.

Dismissal under Rule 12(b)(6) is proper when a complaint lacks "factual

content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft* v. *Iqbal*, 556 U.S. 662,

678 (2009).  "In deciding an unopposed motion to dismiss, a court is to assume

the truth of a pleading's factual allegations and test only its legal sufficiency."

*Haas* v. *Com. Bank*, 497 F. Supp. 2d 563, 564 (S.D.N.Y. 2007) (alteration and

internal quotation marks omitted) (quoting *McCall*, 232 F.3d at 322); *see Blanc* v. *Cap. One Bank*, No. 13 Civ. 7209 (NSR), 2015 WL 3919409, at *2-3 (S.D.N.Y. June 24, 2015).  "A document filed *pro se*," like the complaint here, "is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin* v. *KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008) (Sotomayor, J.) (quoting *Erickson* v. *Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).  Nonetheless, even a *pro se* complaint must contain "factual allegations sufficient to raise a right to relief above the speculative level," including "an allegation regarding [each] element necessary to obtain relief."  *Blanc*, 2015 WL 3919409, at *2 (internal quotation marks and citations omitted).

### 2.    Section 1983 Claims of Inadequate Medical Care

Courts in the Second Circuit analyze a pretrial detainee's claims of unconstitutional conditions of confinement, such as inadequate medical care, under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's Cruel and Unusual Punishment Clause.  *Darnell* v. *Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017); *see generally Yates* v. *Villalobos*, No. 15 Civ. 8068 (KPF), 2018 WL 718414, at *3 (S.D.N.Y. Feb. 5, 2018).  Nevertheless, "[a] detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'"  *Darnell*, 849 F.3d at 29 (quoting *City of Revere* v. *Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

A claim for inadequate medical care requires a showing of "deliberate indifference to ... serious medical needs," which in turn requires proof of two

elements: "medical need" and "deliberate indifference."  *Smith* v. *Carpenter*, 316
F.3d 178, 183-84 (2d Cir. 2003).  The first element, "medical need," is objective,
measuring "the severity of the alleged deprivation."  *Id.*  Courts assessing this
objective prong "examine how the offending conduct is inadequate and what
harm, if any, the inadequacy has caused or will likely cause" the plaintiff.
*Salahuddin* v. *Goord*, 467 F.3d 263, 280 (2d Cir. 2006).  Factors informing this
analysis include "[i] whether a reasonable doctor or patient would perceive the
medical need in question as 'important and worthy of comment or treatment,'
[ii] whether the medical condition significantly affects daily activities, and
[iii] 'the existence of chronic and substantial pain.'"  *Brock* v. *Wright*, 315 F.3d
158, 162 (2d Cir. 2003) (quoting *Chance* v. *Armstrong*, 143 F.3d 698, 702 (2d
Cir. 1998)).  In addition, "the actual medical consequences that flow from the
alleged denial of care will be highly relevant[.]"  *Smith*, 316 F.3d at 187.

The Second Circuit has clarified that the second element, "deliberate
indifference," though often characterized as "subjective," is better understood
as an element simply analyzing *mens rea* because it is "defined objectively."
*Darnell*, 849 F.3d at 29, 35.  Indeed, this so-called subjective prong requires
proof that the defendant "acted intentionally to impose the alleged condition, or
recklessly failed to act with reasonable care to mitigate the risk that the
condition posed to the pretrial detainee even though the defendant[ ] knew, or
should have known, that the condition posed an excessive risk to health or
safety."  *Id.* at 35.  This standard therefore does not encompass "an inadvertent

failure to provide adequate medical care[.]" *Estelle* v. *Gamble*, 429 U.S. 97, 105-06 (1976).

## B.   Analysis

As described above, Plaintiff raises a panoply of allegations against each individual Defendant, arguing that each provided inadequate medical care in violation of the Fourteenth Amendment.  The Court addresses Plaintiff's allegations as to each Defendant in turn.  For the reasons that follow, Plaintiff's Complaint is dismissed in its entirety.

### 1.   Plaintiff's Claims Against Ramos Are Dismissed

The majority of Plaintiff's allegations of inadequate medical care are connected to Ramos.  Even so, Plaintiff fails to provide basic details as to the allegations of misconduct that he levels at Ramos.  (*See generally* Compl.; Hr'g Tr.).  Nevertheless, "constru[ing] [Plaintiff's] pleadings broadly" and "interpret[ing] them to raise the strongest arguments that they suggest[,]" *Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000), the Court discerns Plaintiff to premise his claim on eight distinct allegations wherein Ramos purportedly provided inadequate medical care.  Specifically, Plaintiff alleges that Ramos:

    i.    gave permission to DOC personnel to use excessive force against Plaintiff (Hr'g Tr. 27:18-28:1; 28:18-23; 30:5-15);

    ii.    prevented Plaintiff from receiving assistance with his wheelchair such that he was required to push himself around with one foot (*id.* at 28:1-8);

    iii.    approached Plaintiff "in an irate and an aggressive manner, as if ... to ... touch" Plaintiff (*id.* at 28:8-10);

    iv.    misdiagnosed Plaintiff's injuries, falsely completed paperwork, or instructed other medical staff to complete false paperwork after Plaintiff was assaulted by DOC personnel (*id.* at 28:22-30:4);

    v.    instructed physicians to include in Plaintiff's medical records false claims about Plaintiff's ability to walk (*id.* at 31:10-14);

    vi.    violated HIPAA by discussing Plaintiff's medical conditions (*id.* at 31:5-9);

    vii.    directed that Plaintiff be removed from the NIC (*id.* at 31:13-17); and

    viii.    included a directive in Plaintiff's medical records that Plaintiff be denied a wheelchair (*id.* at 27:14-19).[5]

Although *pro se* pleadings are to be construed broadly, to survive a motion to dismiss, Plaintiff's complaint must contain "factual allegations sufficient to raise a right to relief above the speculative level," including "an allegation regarding [each] element necessary to obtain relief." *Blanc*, 2015 WL 3919409, at *2 (internal quotation marks and citations omitted). Despite the benefit of an extensive colloquy with the Court regarding his specific factual allegations against Ramos, Plaintiff still fails to satisfy both prongs of his inadequate medical care claim: as to the first prong, Plaintiff fails to allege facts to demonstrate "medical need" as to allegations one, two, three, and six; and as

---

[5]    To the extent Plaintiff alleges that any of this misconduct discussed herein is attributed to Ramos's subordinates, and not to Ramos, Plaintiff has failed "plead and prove that the supervisor [*i.e.*, Ramos] had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Tangreti* v. *Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020). Accordingly, as discussed *infra*, Plaintiff has failed to plead that Ramos "had the required subjective knowledge that [Gray] was at a substantial risk" of harm due to receiving inadequate medical care. *Id.*

to the second prong, Plaintiff fails to establish in the remaining allegations that Ramos acted with "deliberate indifference" towards any purported "excessive risk to health or safety." *Darnell*, 849 F.3d at 29, 35.

With respect to allegations one, two, three, and six, Plaintiff fails to plead basic facts to support any finding of "medical need" because Plaintiff advances only conclusory statements regarding Ramos's purported misconduct, and thus fails to "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause[.]" *Salahuddin*, 467 F.3d at 280. For example, Plaintiff alleges that Ramos authorized DOC staff to use "excessive force" against Plaintiff. While, as a general matter, the authorization of the use of excessive force may constitute a constitutional violation, here Plaintiff fails to allege that Ramos gave such authorization beyond a conclusory statement (*see* Hr'g Tr. 30:5-15), and fails to point to any example of such use of force — much less that the use of force occurred at Ramos's direction or with his permission. (*See generally id.*).[6] Similarly, Plaintiff does not offer any information as to how he suffered harm caused by: Ramos's approach of Plaintiff "in an irate and an aggressive manner, as if ... to ... touch" Plaintiff (*see id.* at 28:8-10); Ramos's purported disclosure of information protected by HIPAA (*see id.* at 31:5-9); or Ramos's alleged indifference causing Plaintiff to

---

[6]    At best, Plaintiff pleads that he was subjected to excessive force when he was "moved around" between DOC facilities (Hr'g Tr. 27:24-28:1, 30:5-15), but Plaintiff does not include any support for the proposition that he was in fact subjected to excessive force while being moved. For example, Plaintiff does not state which conduct or force he experienced while being moved that he deemed to be excessive — or that any purported use of force was sanctioned by Ramos.

push his wheelchair with one foot (*see id.* at 28:1-8).[7]  Turning to the Second
Circuit's factors, Plaintiff fails to describe how any of these three allegations
caused "the existence of chronic and substantial pain" or was "important and
worthy of comment or treatment[.]"  *Brock*, 315 F.3d at 162 (internal quotation
marks omitted) (quoting *Chance*, 143 F.3d at 702).[8]  Because Plaintiff does not
allege that any of this conduct actually caused harm or even posed any threat
of harm, Plaintiff fails to establish the first element of his claim of inadequate
medical care.  And because the Court has determined that Plaintiff failed to
satisfy the objective prong with respect to these allegations, it need not analyze
whether Plaintiff satisfies the subjective prong.

With respect to the remaining allegations — four, five, seven and eight —
the Court understands these allegations to arise out of the same underlying
conduct and the same allegation of harm.  Essentially, these allegations
suggest that Ramos caused Plaintiff to be denied a wheelchair for certain
portions of the Relevant Period.[9]  While Plaintiff's account contains only the

---

[7]    Turning more specifically to allegation six, that Ramos violated Plaintiff's HIPAA rights,
courts in this Circuit "have regularly held that HIPAA and its regulations do not provide
for either an express or implied private right of action."  *Edwards* v. *Orange Cnty.*,
No. 17 Civ. 10116 (NSR), 2020 WL 635528, at *2 (S.D.N.Y. Feb. 10, 2020) (collecting
cases).  Instead, a "plaintiff's sole remedy for an alleged HIPAA violation is to lodge a
written complaint with the Secretary of Health and Human Services, through the Office
for Civil Rights, who has the discretion to investigate the complaint and impose
sanctions."  *Orr* v. *Carrington*, No. 18 Civ. 1986 (MPS), 2019 WL 176958 at *3 (D. Conn.
Jan. 11, 2019).  Because Plaintiff has no private right of action under HIPAA, Plaintiff
cannot establish that Ramos violated his constitutional rights by disclosing private
medical information protected by HIPAA.

[8]    Plaintiff does establish that allegation two — that Plaintiff was required to push his
wheelchair with one foot — "significantly affect[ed] [Plaintiff's] daily activities[.]"  *Brock* v.
*Wright*, 315 F.3d 158, 162 (2d Cir. 2003).  However, without more, this allegation is
insufficient to establish a constitutional violation.

[9]    Defendants argue that Plaintiff fails to meet the objective prong with respect to his
allegation that Ramos instructed others not to document Plaintiff's injuries because

barest facts regarding these allegations, construing Plaintiff's claims to raise the strongest arguments they suggest, and accepting Plaintiff's well-pleaded allegations as true, the Court believes Plaintiff has established that the deprivation of a wheelchair did put him at risk of serious harm, and did in fact actually cause Plaintiff serious harm.  Specifically, Plaintiff alleges that while incarcerated at AMKC, he suffered a fall because he was not provided a wheelchair.  (Hr'g Tr. 14:11-13, 38:11-14).[10]  Although Plaintiff does not describe the specific injury that he suffered as a result of this fall, Plaintiff does claim that as a result he had a "bulge or "bump" on his shoulder, was given a wheelchair and a sling, and was returned to the NIC.  (*Id.* at 14:11-16:1).

---

"Plaintiff 'fails to plead facts that could plausibly show how Defendant's record-keeping caused [further] injuries.'"  (Def. Br. 10 (quoting *Fleming* v. *City of New York*, No. 18 Civ. 4866 (GBD), 2019 WL 4392522, at *11 (S.D.N.Y. Aug. 27, 2019), *reconsideration denied*, No. 18 Civ. 4866 (GBD), 2020 WL 2133162 (S.D.N.Y. May 5, 2020)).  However, as discussed *infra*, the Court discerns Plaintiff to plausibly plead that this allegation was part of Ramos's scheme to deprive Plaintiff of the use of a wheelchair, which deprivation caused Plaintiff to suffer a further injury in the form of a fall at the AMKC.

To the extent Plaintiff alleges that Ramos's refusal to share the results of the MRI performed on Plaintiff's shoulder raised constitutional issues, Plaintiff fails to allege that this misconduct caused him any harm.  Therefore, Plaintiff fails to satisfy the objective prong as to any such claim.

[10]  To the extent Plaintiff asks the Court to find that the deprivation of a wheelchair caused him serious harm to his leg in that the injury he suffered prior to his arrival at Rikers was never properly treated, Plaintiff fails to make such an allegation and the Court cannot stretch his Complaint — even as amended on the record on November 20, 2019 — to raise such a claim.  Nor does Plaintiff actually specify any injury to his leg other than that it remained swollen and made walking difficult, though with a more concrete Complaint, such a claim may be cognizable.  And even if the Court were to construe Plaintiff to make this allegation, Plaintiff fails to satisfy the subjective prong because the record contains ample evidence of medical care that Ramos and others provided to Plaintiff for his leg throughout the Relevant Period.  For example, Plaintiff was sent to Bellevue for care (Hr'g Tr. 9:25-10:4), housed at the NIC (*id.* at 11:9-11; 15:13-16:1), and later was "evaluated repeatedly at the request of Ramos, ha[d] his leg checked by doctors on a daily basis, and [was] prescribed Tylenol 3 with codeine" (*id.* at 19:3-12).  Thus, as currently pleaded, the Court cannot conclude that Ramos was deliberately indifferent with respect to injuries Plaintiff suffered in the course of his arrest.  However, as noted below, the Court grants Plaintiff leave to amend his complaint, and Plaintiff may address these deficiencies in an amended complaint.

Given Plaintiff's *pro se* status, the Court determines that this is sufficient to establish that Plaintiff was in fact injured by the fall.  Thus, to the extent Plaintiff alleges that (i) Ramos was responsible for depriving him of a wheelchair at the AMKC, for example by including a note in Plaintiff's medical records that Plaintiff could walk; (ii) Plaintiff's fall at the AMKC was due to this deprivation; and (iii) Plaintiff was in fact injured by this fall, Plaintiff has satisfied the objective prong of a claim for inadequate medical care.

However, Plaintiff fails to meet the subjective prong with respect to these claims.  Specifically, Plaintiff's own account establishes that Defendants provided Plaintiff with immediate medical care after his fall at the AMKC: Plaintiff was examined by a PA, who noted an injury to Plaintiff's shoulder; Plaintiff was then furnished a wheelchair and a sling, given an x-ray, and transferred back to the NIC, where he received further medical care.  (Hr'g Tr. 13:18-23, 14:11-16:1).  As Defendants note, "[t]hese claims exhibit nothing more than a disagreement with [Defendants'] medical judgment, which is insufficient to sustain a claim for deliberate indifference."  (Def. Br. 11 (citing *James* v. *Gage*, No. 15 Civ. 106 (KMK), 2019 WL 1429520, at *11 (S.D.N.Y. Mar. 29, 2019) ("[A]lthough Plaintiff may have preferred a different treatment, that does not make the treatment he received constitutionally deficient.")))).  The Court agrees.  Plaintiff fails to establish that the actions Ramos (and other Defendants) took in response to his fall were inadequate — much less that Defendants "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care[.]" *Darnell*, 849 F.3d at 35.

Finally, although the Court is sympathetic to suffering caused by the periods during which Plaintiff was not provided a wheelchair, Plaintiff fails to allege any specific medical harms directly caused by the deprivation of a wheelchair aside from the fall at AMKC.  For example, Plaintiff advances no plausible allegation that the "medical emergency" he suffered at OBCC was caused by the deprivation of a wheelchair.  (Hr'g Tr. 23:18-24:14).  And while Plaintiff clearly suffered an indignity at being forced to drag himself across the floor at various times due to the deprivation of a wheelchair (*see id.* at 19:21-21:08, 23:5-13), Plaintiff does not plead that this caused him any medical harm in satisfaction of the objective prong.  *Accord Kendall* v. *Kittles*, No. 03 Civ. 628 (GEL), 2004 WL 1752818, at *6 (S.D.N.Y. Aug. 4, 2004) ("While the Court sympathizes with [plaintiff's] embarrassment, some … loss of dignity is an inevitable consequence of incarceration, and, so long as no serious medical consequences result, these allegations likewise do not amount to a Constitutional deprivation [for provision of inadequate medical care]."); *see also Harris* v. *City of New York*, No. 15 Civ. 6341 (NG) (JO), 2018 WL 1997974, at *6 (E.D.N.Y. Apr. 27, 2018) (rejecting claim of inadequate medical care arising out of an injury that "offended dignity" but did not pose an unreasonable risk to health, because a "plaintiff alleging deprivation of medical treatment … is required to show that the deprivation of medical treatment posed an unreasonable risk to her health, which means she is required to show that the condition for which she was denied treatment was sufficiently serious").  Thus, Plaintiff's claims against Ramos must be dismissed.

19

## 2.     Plaintiff's Claims Against Katz Are Dismissed

Plaintiff argues that Katz provided inadequate medical care in violation of the Fourteenth Amendment because she ignored Plaintiff's complaints and misdiagnosed Plaintiff's medical conditions, despite being aware of Plaintiff's medical needs.  (Hr'g Tr. 32:11-33:13).  Specifically, Plaintiff alleges that at some unspecified point during the Relevant Period, Katz refused to give Plaintiff medical attention for his injured leg and failed to send him to Bellevue for necessary medical attention.  (*Id.* at 33:18-25, 35:7-12).  Plaintiff alleges he saw Katz less than five times during the Relevant Period, and that Katz was always supervising another physician.  (*Id.* at 34:16-18, 35:13-20).[11]  After a thorough review of Plaintiff's allegations, the Court determines that Plaintiff fails to establish the first element required to make out a claim for inadequate medical care in violation of the Fourteenth Amendment because Plaintiff's allegations against Katz are unsupported by the requisite factual predicate to "nudge [plaintiff's] claims across the line from conceivable to plausible." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).

For example, Plaintiff does not state how or when Katz misdiagnosed him, and in fact, Plaintiff alleges that Katz's diagnosis — that Plaintiff suffered a fracture or other serious injury to his leg — was confirmed by physicians at Bellevue.  (*See* Hr'g Tr. 7:25-8:17, 9:15-24, 11:3-8).  Thus, the Court cannot

---

[11]     The Court does not understand Plaintiff to seek to hold Katz accountable for any actions of her subordinates.  However, to the extent Plaintiff alleges that Katz's subordinates — and not Katz — engaged in the misconduct discussed herein, Plaintiff has failed to "plead and prove" that Katz, as a "supervisor[,] had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Tangreti*, 983 F.3d at 616.

discern any injury or harm caused by Plaintiff's vague allegation that Katz misdiagnosed him.  Nor can the Court discern when Katz purportedly denied Plaintiff a visit to Bellevue or ignored Plaintiff's complaints, nor how any such denial injured or harmed Plaintiff.  Accordingly, Plaintiff fails to establish the objective prong of his claim as to Katz, and the Court need not analyze whether Plaintiff has satisfied the subjective prong.

### 3.    Plaintiff's Claims Against Scrimmager Are Dismissed

Plaintiff argues that Scrimmager provided inadequate medical care in violation of the Fourteenth Amendment by failing to provide Plaintiff with medical care at Ramos's direction.  (Hr'g Tr. 36:18-25).[12]  Plaintiff's allegations against Scrimmager are devoid of detail; however, the Court discerns Plaintiff to raise five claims against Scrimmager, including that he:

> i.     failed to evaluate Plaintiff or send Plaintiff out for testing after Plaintiff was assaulted in May 2018 (*id.* at. 36:1-6);
>
> ii.    failed to provide Plaintiff with pain medication or send Plaintiff to Bellevue for further evaluation with respect to pain management (*id.* at 37:1-13);
>
> iii.   failed to transfer Plaintiff from the general population to a more accommodating dorm where Plaintiff could receive assistance (*id.* at 37:14-21);
>
> iv.    fabricated notes and falsely claimed that Plaintiff refused to go to Bellevue (*id.* at 37:25-38:6); and

---

[12]    It is unclear if Plaintiff alleges that Scrimmager engaged in improper behavior at Ramos's request or on his own volition.  However, the distinction is immaterial to resolving the instant motion, as Plaintiff fails to state a claim for any of Scrimmager's alleged misconduct.

v.   failed to assist Plaintiff in remedying an issue
with his wheelchair, causing Plaintiff to fall out of
the wheelchair (*id.* at 38:7-14).

However, after a careful review of Plaintiff's allegations, the Court concludes
that he fails to satisfy both elements required to establish a claim for
inadequate medical care under the Fourteenth Amendment.

As an initial matter, Plaintiff does not describe any of the purported
harm suffered as a result of allegations one, four, and five. Thus, while the
Court can imagine how these actions may have caused Plaintiff harm, the
Court cannot construe Plaintiff's Complaint to plead factual allegations it does
not contain. Turning to Second Circuit's factors, Plaintiff fails to describe how
any of these allegations is "important and worthy of comment or treatment,"
causes "the existence of chronic and substantial pain[,]" or "significantly affects
daily activities." *Brock*, 315 F.3d at 162 (internal quotation marks omitted)
(quoting *Chance*, 143 F.3d at 702). Accordingly, any claims premised on these
allegations must be dismissed.

Turning to the second allegation, the Court agrees with Defendant that,
as pleaded, "Plaintiff's disagreement with Dr. Scrimmager regarding his pain
control is insufficient to establish a claim for deliberate indifference." (Def.
Br. 12). Plaintiff stated that while under Ramos and Scrimmager's care,
Plaintiff was prescribed Tylenol 3 with codeine. (Hr'g Tr. 19:3-12). Thus,
although Plaintiff failed to plead that he was actually harmed by Scrimmager's
failure to prescribe his preferred pain medication, the Court agrees that "'[t]he
decision to prescribe one form of pain medication in place of another does not

constitute deliberate indifference.'" (Def. Br. 12 (collecting cases and quoting *Rush* v. *Fischer*, No. 09 Civ. 9918 (JGK), 2011 WL 6747392, at *3 (S.D.N.Y. Dec. 23, 2011))).  Plaintiff must allege more concrete harm that this purported misconduct caused in order to survive a motion to dismiss.

As to Plaintiff's third allegation, the Court liberally construes Plaintiff's complaint to allege that this misconduct caused Plaintiff to be denied a wheelchair for certain periods of time during the Relevant Period.  As noted above with respect to the Court's analysis of similar allegations against Ramos, the Court determines that Plaintiff has satisfied the objective prong by suggesting that his fall at AMKC resulted from the denial of a wheelchair. However, using that same analysis, the Court finds that Plaintiff has similarly failed to satisfy the subjective prong because Plaintiff's own account establishes that Defendants provided Plaintiff with immediate medical care after his fall at the AMKC.  Therefore, the Court cannot find that Plaintiff has plausibly alleged deliberate indifference, and Plaintiff's claims against Scrimmager must be dismissed.

### 4.    Plaintiff's Claims Against Testa Are Dismissed

Plaintiff alleges that mental health supervisor Testa violated Plaintiff's Fourteenth Amendment rights by authorizing one of her subordinates to evaluate Plaintiff with a correctional officer present in violation of HIPAA.  (Hr'g Tr. 38:21-40:16).[13]  As discussed *supra*, there is no private right of action

---

[13]    At various points on the record on November 20, 2019, the name is presented as "Tesla."  (*See, e.g.*, Hr'g Tr. 28:21-39:24).

under HIPAA.  *See Edwards* v. *Orange County*, No. 17 Civ. 10116 (NSR), 2020 WL 635528, at *2 (S.D.N.Y. Feb. 10, 2020) (collecting cases).  For the same reason this claim is not viable against Ramos, Plaintiff's claims against Testa must be dismissed.[14]

### 5.    Plaintiff's Claims Against Onuora Are Dismissed

Plaintiff alleges that Onuora: (i) gave medical clearance for Plaintiff to be placed in punitive segregation, despite never physically evaluating Plaintiff (Hr'g Tr. 40:22-41:10), and (ii) fabricated medical notes in which he documented that he evaluated Plaintiff when he did not do so (*id.* at 41:22-42:20).  Plaintiff fails to establish that either allegation satisfies the objective prong, and thus his claim for inadequate medical care must be dismissed.

*First*, Plaintiff fails to plead that his confinement in punitive segregation caused him medical harm.  Even if Plaintiff did make such an allegation, courts in this Circuit have required much more serious harm than is suggested from Plaintiff's account in order to find that conditions of solitary confinement violate the due process clause of the Fourteenth Amendment.  *See, e.g.*, *Sealey* v. *Giltner*, 197 F.3d 578, 589 (2d Cir. 1999) (holding that 101 days in solitary confinement did not give rise to a Fourteenth Amendment violation); *see also*

---

[14]    To the extent Plaintiff alleges Testa authorized DOC staff to use force towards him (*see* Hr'g Tr. 30:10-15 ("[B]efore [DOC staff] do a use of force and they extract or use any type of aggression towards a[n] inmate, they get permission or go and see a medical staff or mental health, which is Miss Amber Tesla, who gave DOC the permission to remove me from that facility, however they would have to do so.")), his allegations fail for the same reasons discussed above with respect to similar allegations directed at Ramos.  And Plaintiff also fails to "plead and prove" that Testa, as a "supervisor[,] had subjective knowledge of a substantial risk of serious harm to" Gray posed by either (i) the presence of a correctional officer at Gray's evaluation by Testa's subordinate, purportedly in violation of HIPAA, or (ii) the vague use of force allegation in Plaintiff's account.  *See Tangreti*, 983 F.3d at 616.

*Sandin* v. *Conner*, 515 U.S. 472, 476 (1995) (holding that thirty days of solitary confinement did not violate constitutional due process rights). *Second*, Plaintiff does not allege that he was harmed by any purportedly false or fabricated medical notes created by Onuora. *See Arnold* v. *Westchester Cnty. Corr. Facility*, No. 10 Civ. 1249 (PAC) (RLE), 2011 WL 3501897, at *5 (S.D.N.Y. July 18, 2011) (dismissing constitutional claim arising out of allegedly falsified medical records where plaintiff failed to allege the falsification caused harm), *report and recommendation adopted*, No. 10 Civ. 1249 (PAC) (RLE), 2011 WL 3475407 (S.D.N.Y. Aug. 9, 2011). In sum, without an allegation that Onuora's actions caused him harm, Plaintiff fails to satisfy the objective prong.

## C.   Leave to Amend Is Granted in Part and Denied in Part

"Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court 'should freely give leave [to amend] when justice so requires.'" *Gorman* v. *Covidien Sales, LLC*, No. 13 Civ. 6486 (KPF), 2014 WL 7404071, at *2 (S.D.N.Y. Dec. 31, 2014) (quoting Fed. R. Civ. P. 15(a)(2)). Consistent with this liberal amendment policy, "'[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.'" *Id.* (alteration in *Gorman*) (quoting *Block* v. *First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). Nonetheless, "it remains 'proper to deny leave to replead where ... amendment would be futile.'" *Id.* (quoting *Hunt* v. *All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998)).

Plaintiff has been offered the opportunity to amend his complaint, which opportunity Plaintiff declined. (*See* Hr'g Tr. 45:9-46:15). Plaintiff has also had

the benefit of an extensive colloquy with the Court, during which Plaintiff detailed the facts underlying his complaint and which colloquy the Court deemed to supplement Plaintiff's complaint.  (*Id.* at 5:1-43:9).  Additionally, Plaintiff failed to oppose Defendants' motion to dismiss, despite a generous briefing schedule and multiple extensions to file an opposition.  (*See* Dkt. #30, 43-44).  Nevertheless, a *pro se* complaint "should not be dismissed without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated[.]"  *Shomo* v. *City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (alterations and citation omitted).  So too here.

The Court has determined that amendment would be futile as to Plaintiff's allegations arising out of any purported violation of HIPAA. Accordingly, Plaintiff's claim against Testa is dismissed with prejudice without leave to amend, as is his claim against Ramos to the extent it is premised on any purported violation of HIPAA.  Additionally, Plaintiff has not suggested that he might be able to establish a valid claim against Katz, because his allegations against Katz consist entirely of legal conclusions unmoored from any specific factual allegations.  Thus, Plaintiff's complaint is dismissed with prejudice as to Katz.  However, the Court cannot conclude that it would be futile to allow Plaintiff to amend his other claims.  Therefore, the Court grants Plaintiff leave to file an amended complaint, but only as to Plaintiff's claims against Ramos, Scrimmager, and Onuora, and, even then, only to the extent Plaintiff refines the claims already raised in his original complaint as amended on the record

on November 20, 2019.  In other words, Plaintiff is not granted leave to plead wholly new claims.

Plaintiff is directed to file an amended complaint within sixty days of the date of this Opinion that addresses the problems identified above.  Any new amended complaint will replace, not supplement, the complaint currently before the Court.  It therefore must contain all of the claims and factual allegations Plaintiff wishes the Court to consider, including the specific actions or omissions of each Defendant that allegedly violated Plaintiff's constitutional rights.  If Plaintiff fails to abide by the sixty-day deadline, this action will be dismissed with prejudice for failure to prosecute.

## CONCLUSION

For the reasons set forth in this Opinion, Defendants' motion to dismiss is GRANTED.  Plaintiff's claims against Katz and Testa are dismissed with prejudice, as are his claims against Ramos to the extent they arise out of any purported HIPAA violation.  Plaintiff's other claims against Ramos, Scrimmager, and Onuora are dismissed without prejudice with leave to amend, but only as to those claims that were raised in Plaintiff's original complaint and clarified on the record during the hearing on November 20, 2019.  As detailed above, Plaintiff may file an amended complaint within sixty days of the date of this Opinion.  Failure to abide by this deadline will result in the remaining claims in this case being dismissed with prejudice.

The Clerk of Court is directed to terminate the motion at docket entry 34. The Clerk of Court is further directed to mail a copy of this Opinion to Plaintiff at his address of record.

SO ORDERED.

Dated:   March 2, 2021
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge